District Court, with Mergolies was advised to take a guilty plea to a two-count indictment by an attorney who had not investigated the facts central to the first count and who had not even informed him of a rock-solid defense to the second. Mr. Mergolies sought habeas relief pro se to remedy this ineffective assistance. The District Court, however, dismissed the petition without holding a hearing or receiving any evidence at all. What's more, in summarily dismissing the petition in this way, the District Court committed grave factual and legal errors, many of which the government does not defend on appeal. This Court has repeatedly concluded that it disapproves of summary dismissal of habeas petitions, and a summary dismissal was certainly uncalled for here. Mr. Mergolies was charged in connection with his involvement in a few street-level drug sales and the passive receipt of a single video of child pornography that he deleted immediately. On the advice of counsel, he pled guilty to both counts of the indictment and ultimately received a 14-year guideline sentence despite this being his first-ever interaction with the criminal justice system. Right. But I mean, he was potentially looking at a 20-year mandatory minimum, right? Your Honor, if the government had superseded the indictment Well, it was always the government's contention that his sale caused the death, right? That is correct. The government had taken the position that his sale had caused the death. That was contained within the confines of a plea agreement that counsel advised Mr. Mergolies to agree to. It is our position that Mr. Mergolies' counsel advised his client, Mr. Mergolies, to accept the plea agreement and stipulate to the death results issue without conducting any independent investigation into the circumstances of the decedent's death, and in our view, not even fully understanding the Supreme Court's Burge decision and the forecausation rule that it announced. All right. But the risk was is that the longer you wait, the more likely the government is going to be to insist then on the 20-year mandatory minimum. So that's not 160 or 168. That's 240, right? Yes, Your Honor. It is. But here, Your Honors, the indictment that Mr. Mergolies faced didn't have the death results charge. The government would have had to supersede the indictment. Right. And the plea They had been known to do that. Correct, Your Honor. The plea agreement here stipulated to the issue. I mean, Mr. Mergolies could have something Stipulated to facts that under this indictment would keep him under a 20-year mandatory minimum and would give him lower guidelines, which we're not finding, so the potential was for even a far lower sentence, right? That's correct, Your Honor. The stipulated plea guidelines that Mr. Mergolies agreed to on the advice of counsel put him at a 14 to 17.5-year exposure. The difference he may have received As low as nothing, right? I mean, there's no mandatory minimum at all. That's correct. Yeah. And, Your Honor, had Mr. Mergolies challenged the evidence on the death results issue and succeeded, his exposure would have been significantly less. So the risk calculus Mr. Mergolies is facing is does he accept an almost guaranteed sentence between 14 and 17.5 years to avoid 20, or does he challenge the government's evidence? Why do you say almost guaranteed? Well, Your Honor I mean, in this district, defendants are sentenced within the guidelines less than 20 percent of the time. So why do you think it would be guaranteed that he would be getting a guideline sentence? He ended up getting the low end of the guideline sentence, but why are you saying it would have been guaranteed? So I didn't mean to say guaranteed, but it is, as I understand it, quite rare for the variance that the defense counsel sought to receive here to be granted. And so the odds were fairly significant that Mr. Mergolies would have faced a 14 to 17.5-year sentence, and, Your Honor, she ultimately did receive a 14-year sentence. No, I mean, that's right, but the issue is sort of at the time he took his plea, did he understand the risks and the possibilities? I think that's right. I think, Your Honor, Mr. Mergolies clearly did not understand the full risks he faced because he was on the understanding that the government's burden to meet the but-for, or the causation element within the statute was far lower than it actually was. But what's your basis for saying that they wouldn't be able to meet that? Or that, in other words, you're arguing ineffective assistance, and so that's two prongs of prejudice. It seems to me what you're arguing is that there, had an investigation or a better investigation been done, they might have come up with better evidence to refute any but-for causation theory. But why is that not just completely speculative? Well, Your Honor, our position, I think, is broader than that. Our position is that the state of the record available to defense counsel at the time he pushed Mr. Mergolies to take a plea was itself insufficient for the government to meet its burden under Burrage. And the government, on appeal, doesn't cite a case where that, the facts that defense counsel knew was found to be sufficient to sustain a conviction on the death results charge. Every case they've cited involved far closer evidence in time between the usage and the death, and almost all of them involved toxicology analysis, pharmacology analysis. Right, but you're asking for something else. You're basically saying the person should not be permitted to plead guilty, pursuant to a plea agreement, without a full-blown investigation and without basically contesting under Burrage. And I just don't see where is the authority for that. Your Honor, I think I would say our position is slightly lighter than that. I think defense counsel has an obligation to conduct some investigation. The record here makes it Or perhaps even just to inform the client of the availability of the, or of the issue and the possibility of an investigation. I think that's exactly There's a sliding scale here, right? It's not saying anything at all about the causation standard and not doing any investigation to what Judge Sullivan is talking about, which is maybe ideal in some circumstances, but maybe not required. I think that's exactly right. I think the important point here, as Judge Muriam I think hints at, is that the record screams out that defense counsel simply did not know about the government's burden of but-for causation. And an example of that, you know, we identify seminar brief. Another I'd offer is the government represented at Mr. Margulies' bail hearing that there was, quote, various heroin or perhaps fentanyl in the decedent system. A defense counsel aware of Burrage, that would have set off alarm bells. But it didn't. And how do we know it didn't? For a number of reasons. But the most available is hours after the bail hearing, there was a bail appeal before Judge Wood, where the causation issue was addressed and defense counsel did not mention the damning admission he had just heard hours before that there might be multiple toxins within the decedent's body at the time of death. That to me suggests defense counsel simply wasn't aware of Burrage, didn't know the but-for causation rule, and as the record subsequently shows, certainly didn't advise his client to the but-for rule because Mr. Margulies never admitted to the but-for rule. And counsel wasn't asked to respond to the habeas petition in this case, right? That's right. Exactly. Unlike, you know, I think the Court will notice that we rely quite heavily on a decision out of the Seventh Circuit called Anderson. In that case, the Court did, as I understand is typical, ask defense counsel to at least explain the steps he took to investigate the causation issue and whether in fact he knew the causation issue was a key component. I mean, I see him over my time. The one other point I'd add, Your Honors, is that the death results issue was catastrophically significant to Mr. Margulies' exposure. So it's not our position that defense counsel are always obligated to conduct a robust investigation when they're presented with a plea agreement that provides them the benefit of avoiding a larger exposure. But here, where the consequences of the death results enhancement were so catastrophic, I find there to be no excuse for defense counsel not to have at least probed the question of whether the... But that goes to the first prong of Strickland. It seems to me you're saying that it's really unacceptable to not do more. But I'm just trying to figure out what is the basis for thinking that doing more would have made a difference? I mean, often when somebody is making this argument, you know, a habeas, it's because they've found an alibi witness or they've found somebody who is an exculpatory witness that defense counsel missed. And then the prejudice prong sort of takes care of itself. Here, you seem to be saying that had there been a proper and aggressive investigation, they might have come up with something. And is that enough to establish prejudice under Strickland? Your Honor, I think it might be. Might be. That doesn't sound very sure. Your Honor, I think... Isn't it more than that? I mean, you're pointing to the fact that at a bail hearing, the government made a statement suggesting that there was another toxin found in addition to heroin, fentanyl or something else was present. Thank you, Judge LaValle. That's exactly where I was headed in response to Judge Sullivan's question. The record here is we have a statement from the government. The government seems to walk away from the statement in its appellate brief in a footnote stated without evidence that it was a straight comment. But that statement came from the prosecutor's own mouth on the record, was never corrected, and is a party admission as I understand it. And by failing to hold a hearing on Mr. Margulies' habeas petition, we never had a chance to question that prosecutor to see whether the government's unsupported assertion that she misspoke is correct or whether her admission is accurate. And in fact, the government has evidence that there was various heroin and fentanyl in the decedent system. And if those two facts are true, the prejudice here is undisputed. So you're saying the way to measure the prejudice is by looking at the likelihood that the defendant would have balked at agreeing, A, to the proposition that the sold drugs caused death, and B, to entering into the plea agreement at all when that was a condition of it. Or, well, entering into the plea agreement at all upon the recognition that if there was another toxin found in the body, that becomes much harder for the government to prove what is required for death penalty. I think that's exactly right, Your Honor. The one thing I would add is that the standard here is not for Mr. Margulies to establish that the proceedings would have ended differently. He needs to establish a reasonable likelihood that they may have ended differently. And this Court has stated that's a less standard than more likely than not. So here, even if there is some world in which this goes back down and it turns out that the prosecuting attorney did misspeak and that there wasn't various heroin or fentanyl in the system and there's further evidence of causation, that doesn't mean sitting here right now. It isn't reasonably likely that if this case is remanded, that we will learn that defense counsel's representation was insufficient to a degree that had he investigated or informed his client of the proper standard. So how do we approach measuring that likelihood? What's the question that we ask ourselves about reasonable likelihood? How do you frame the question that's the appropriate question for us to consider? Well, I think we're a bit at a loss because we haven't had any factual development on Mr. Margulies' pro se habeas petition. So it is our principal request that this Court remand for a hearing so that these issues can be flushed out and we can understand what exactly defense counsel did, what exactly defense counsel didn't do. We think the record makes it fairly clear that defense counsel did almost nothing. But this Court has said kind of repeatedly that defense counsel should be given an opportunity to explain what they've done and the steps that they took. I'm confident that once those evidentiary submissions are provided, we'll learn defense counsel did almost nothing, as Mr. Margulies asserted in his petition, and as we believe the record makes clear. Do we need to vacate the district court's ruling in order to make such a remand? Or do we simply say we remand for the district court to make these investigations but for the moment leave the ruling standing? Well, I think the Court would have to vacate the dismissal of the petition so the petition was dismissed in full. So I believe this Court would have to vacate the dismissal of the petition, allow it to reopen and remand for a hearing where these issues can be thoroughly flushed out. Why would we need to do that? Why couldn't we just say what we're doing for the moment is just remanding for just telling the district court to investigate, to hold a hearing on these questions? Your Honor, I don't think we would have an objection to that. What we're principally seeking is a hearing where Mr. Margulies' factual assertions can be tested. And if that doesn't require formal vacatur of the dismissal, I think we'd be okay with that. I see I'm well over my time. I haven't addressed the issues as to the second count of the indictment. I'll take Your Honor's guidance as to whether you'd like me to proceed. We're also happy to rest on the papers. Well, I think it would be good to hear what is to be said about the child porn offense. Sure. So the second instance of ineffective assistance of counsel that Mr. Margulies has alleged was that his counsel was constitutionally ineffective in failing to advise Mr. Margulies about the existence of the Section 2252A-D affirmative defense, which is tailor-made for Mr. Margulies' circumstances. The defense provides that a defendant is not guilty of a child pornography charge if they were in possession of less than three videos and they promptly and in good faith deleted them. Less than three images. Correct. Images. Your view is that a video is a single image? Correct, Your Honor. I mean, it's not under the guidelines. I haven't found any case law on this one way or the other. But under the guidelines, a video is deemed to be the equivalent of 75 images. That's correct, Your Honor. The Sentencing Commission has determined that convicted offenders of child pornography charges for purposes of sentencing should be sentenced as if videos contain multiple images. Is there any authority that suggests videos are indistinguishable from images for purposes of the statutory defense? Yes, Your Honor. First, I'd identify that the government has not raised this argument on appeal. No, I didn't say that either. I'm just curious. Sure. So as we lay out in our opening brief, we identify in detail the legislative history of the statutory defense, which made clear that the drafters of the defense assumed that the defense would apply to videos. If you take the position that a single video is multiple images, you by definition are saying that the statutory defense is unavailable to videos. But all the folks in the legislature on both sides assumed the defense was meant to protect people like Mr. Margulies, who were unsolicitedly sent videos of child pornography that they didn't ask for, they never said they wanted, and that they deleted immediately after seeing it. And so I think it would not just align with the language of the statute. I think it would also... But then you also have to establish that he promptly, in good faith, took reasonable steps to destroy it. And what's in the record to suggest that? Sure. So what's in the record as to the promptly component are Mr. Margulies' statements to the probation department where he informed them that he deleted the video prior to even responding to the individual that sent him the message unsolicited. There's no evidence in the record to dispute that. There's no contrary indication that Mr. Margulies had the video for seconds, minutes, hours. The government surmises that perhaps it could have been between immediate and a few weeks by reference to this unsupported suggestion that Mr. Margulies kind of conducted a mass deletion of his phone. It cites almost nothing in the record for that. It cites a prosecutor's statements on the record that doesn't point to any evidence. It just suggests that there was a mass deletion. We would suggest Mr. Margulies' statement to the probation department, which could... Angry, right? That's correct. There are statements that he made to the probation department where he both identified that he was surprised and annoyed by it and explained to the probation department exactly why he didn't respond, as Your Honor is suggesting. But the statute identifies two bases to come within its protection. An individual can either destroy the image or report it to law enforcement. It does not require anything different. So if Mr. Margulies destroyed the image or destroyed the video, he is within the confines of statute. He has to do it promptly and in good faith, right? With reasonable steps. So, I mean, all you guys are going to say is that, you know, this would have been easy to prove at trial, but it's not clear to me what that evidence would be at trial. What would it be? The evidence of his good faith deletion? You're saying he would testify to say that I... I mean, there's nothing in the record that so indicates when he did this, right? How many days or weeks or hours? In the current record, there is not. Of course, we're working on a limited record. No, no, no. Well, there's some evidence in the record, right? Like, so the government... To me, I think the window is somewhere between the date he receives it, which is October 25th. That's right. The very latest, right, they find the deleted video January 13th, right? So that's... So, first of all, that's three months. So we don't know what promptly means. So I think it's probably not 80 days, but okay. But then the government at one point talks about that its history had been deleted through something like October, through October or November. So if the link is received October 25th, and, you know, it's hard to know. There's somewhere... Does promptly have to mean the moment it happens? Does it have to be what he said he has told probation before he responds? Or can it be a week? Can it be... I mean, there's almost no case law on this, right? What promptly means, I don't know what it means. Exactly. And Judge Maroon, I think you're hinting at the important question, which these questions are ones that will ultimately have to be fleshed out. But wait a minute. I thought in effective assistance at counsel claim, you have to actually... You have to make arguments and present some reason to think that they would be prejudiced. You seem to be, again, saying that... And if he had been a good lawyer, they might have found something. Or there might have been stuff that would have established this defense. But what prevented that from happening below? Well, Mr. Margolis identified in his petition that he deleted the video and was... Yeah, but that's not enough. Deleting is not enough, right? It has to be deleted promptly and in good faith with reasonable steps to destroy it. But there's... Did he say nothing about when he deleted it? Within his petition? I believe... I actually don't... I don't have that directly in front of me. I believe he said he deleted it promptly. I believe he identified the language from the statute and tracked that language to say that he conducted the conduct that would get him within the confines of the statute. I'd also remind Your Honors, Mr. Margolis' petition was pro se. And, of course, for good reason, pro se submissions should be, you know, construed with some latitude. I think here... I'll remind the Court that the government didn't even argue in front of the district court the promptness or good faith component. Isn't there another factor that's potentially of some significance that the district court... Am I correct that the district court regarded the admission that there was child erotica as if it... as if it demonstrated that there was also additional child pornography that would make him ineligible for the defense? Yes, Your Honor. I think it's even worse than that. I think underlying the district court's error was its conflation of child erotica with child pornography. But what the district court actually said was worse than that. The district court said Mr. Margolis had a collection of child pornography. And this is something the district court said multiple times. And when it said it the second time in rejecting Mr. Margolis' habeas petition, it compounded the error by not only stating Mr. Margolis had a collection of child pornography, which I want to be very clear, there was zero evidence in the record that Mr. Margolis was ever in possession of any child pornography other than the single video that was sent to him unsolicited and that he deleted immediately. What the district court said in its ruling dismissing the habeas petition, again, was not only that Mr. Margolis had a collection of child pornography, but that he admitted to that. That is a fundamental misreading of the record. What I believe the district judge was referring to was that there was a dispute in the drafting of the pre-sentence report as to how many images of child erotica were on Mr. Margolis' devices. The probation department took the position that there were 35,000 images of child erotica. Mr. Margolis at every turn heavily disputed that. It was his position, I believe, that there were 35,000 images on his devices. And so he disputed, he acknowledged that some of those images may constitute what the probation department was referring to as child erotica. But he never remotely suggested that he ever possessed child pornography beyond the one video, again, that was sent to him unsolicited and that he deleted immediately. All right, but he had 35,000 images of child erotica. That's what's in the PSR, right? That's disputed in the PSR. So the PSR notes counsel's objection to that in the PSR. So the dispute, so you're saying there's no, so I guess I want to make sure I understand what the dispute is. I mean, you're saying there's no child erotica or there's 35,000 images of child erotica or some number in between? The record isn't clear as to, from Mr. Margolis' perspective, how many images of what the probation department terms to be child erotica exist. Of course, that's not a term that's a legal term. No, but it might be relevant to this defense, right? In other words, whether somebody deleted it promptly in good faith, it might be relevant that they are an avid collector of child erotica as to determining whether or not they really deleted it in good faith or something else. Well, I respectfully disagree, Your Honor. This Court has held that the mere possession of child erotica is insufficient to determine that a defendant has a predilection for child pornography. The child erotica in this case, I mean, again, that's an undefined term. I'm using it because the probation department used it. But the child erotica that the government identified in the complaint is far and away from child pornography. It's not even close. It is cartoons. It is adult conceptual intercourse. To even suggest that those images, as a matter of common sense, suggest that someone has an interest in child pornography is far afield. And I would suggest, Your Honors, that the fact that the government, after conducting an extensive review of multiple devices of Mr. Margulies, and the only child pornography it was able to find was located in a deleted cache, a video that was sent to him unsolicited that he didn't ask for and that he deleted, removes any suggestion that Mr. Margulies has some predilection for child pornography, contrary to the district court's clear inclinations. All right. Well, we've gone way over, but let's hear what Mr. Salamatti has to say, and then we'll get back to you for three minutes, Mr. White. Thank you. Good afternoon. May I please the court? My name is Adam Salamatti, and I represent the government in this appeal. Oh, it's Salamatti or Salamatti? Salamatti, Your Honor. S-A-U? S-O-W-L-A-T-I. S-O-W, sorry. The defendant makes two arguments in support of his petition. First, the defense counsel failed to advise him of the barrage but for cause standard and also failed to investigate the circumstances behind the victim's overdose death. And second, the defense counsel failed to inform the defendant about an affirmative defense available to him as to his child pornography count. I'll address each argument in turn. And I'm going to start by focusing on the underlying proceeding. The petition for habeas relief. If you look at the petitions for habeas relief, if you look at the defendant's reply, if you look at his ex parte motion for toxicology report, at no time did he ever say the defense counsel misadvised him of the barrage standard. And that's significant because the record suggests that the parties were aware of the standard. We cite many examples in our brief, but I'm just going to focus on a few here. I'm going to focus on the plea agreement. The plea agreement used the resulted from language. And the defendant acknowledged in his plea colloquy that he had read the plea and discussed with counsel who explained its terms. That's at appendix 73 and 74. And in barrage, Justice Scalia suggested that's all that's required. Justice Scalia was examining the resulted from language, the statutory text, and he said that the plain meaning means but for causation. He looked at the dictionary definition and he looked at common parlance. And as a result, courts that have examined the issue of whether jury instructions are proper have held that simply quoting the statutory language is perfectly fine. You look at the Lammer case, which we cite in our brief. Quote, in most, if not all cases, simply repeating the statute's results from language will adequately alert jurors that but for or sufficient causation is needed. So the defendant was well aware of this standard. Now, focusing on the second argument. Wait. The defendant was well aware of what? Of the standard under barrage. He was well aware that but for causation was required? Yes, Your Honor. As opposed to contributing to the cause? Yes, Your Honor. Because if you look at the point. I think you've gotten to that point a little too easily. Your Honor, I'm focusing on Justice Scalia's opinion. I get it all but the therefore. Your Honor, I'm focusing on Justice Scalia's opinion in barrage. Where he said despite the background case law that might have developed around resulted from, which of course could take into account legislative history, common law, the plain meaning of the statute, the common parlance of resulted from is but for causation. And courts have, I mentioned the Lammer case, but I'm also mentioning the Alvarado  case where the court, this is the Fourth Circuit, said, quote, barrage court held that results from in 841B1C invokes the, quote, ordinary accepted meaning of the phrase. So the government's position is that. The phrase being results from? The ordinary definition of resulted from which Justice Scalia says is but for causation. So we had enough dispute about what resulted from meant in this country that we had to go all the way to the Supreme Court and then we had some more dispute there about it. And yet, remember that there's a difference between you and I understanding what the natural meaning is and the purpose of the Sixth Amendment protections and the effective assistance of counsel being to advise a lay person about that meaning. So even if the words resulted from are in his plea agreement, is that enough to get to his client, but say, make sure you've read this and let me know if you have questions? Yes, Your Honor. If you, I take your point that there was obviously extensive litigation for this case to get to the Supreme Court. You're saying, if I understand correctly, you're saying if you went to the average citizen and said, okay, here's the question. We have the phrase resulted from. Does this mean that it was the but for causation explaining what that means? Or is it satisfied also by a circumstance where the thing contributes to the cause of the death, but is not necessarily the same? That you're saying that 100% of the citizens would say, oh, no, that's clear. It means but for causation. Your Honor, that's what Justice Scalia suggested in his opinion. He looked at the common parlance of the phrase. But I'm asking you. You're telling us that we should adopt the proposition that the ordinary citizen, if the question were posed in that way, would say, oh, it's very clear. There's no reason for doubt. It means it doesn't mean contributed to the cause, contributed to causing death. It means that without it, death wouldn't have occurred. Your Honor, that is the government's position, and that was the Seventh Circuit's opinion in Lammer. The Court says, and I'll again quote, in most, if not all cases, simply repeating the statute's results from language will adequately alert the jury. That's for a jury instruction. Yes, Your Honor. Okay. To be clear, it's not what constitutes Sixth Amendment effective assistance of counsel. Right. But there is no indication in the record that defendant was ever misled about this or misadvised about the standard. Well, but are you saying that ineffective assistance of counsel can consist only of affirmatively misleading as opposed to failing to inform of things that are important? Your Honor, where the plain language is clear, where the plain meaning of a phrase is clear resulted from, we do think so. And I would also note, if you look at the defendant's own words in his plea colloquy, he said the victim died after having ingested some of the heroin included in his delivery. And after is temporal, not causation. Well, if you look at his sentencing, the defendant said his actions caused irreparable harm. He said he was enmeshed in a narcotics conspiracy. He, quote, did not concern himself with the consequences of his actions. Well, I will tell you that 90% of drug conspiracy defendants say that, whether or not anybody died. There are lots of consequences to drug dealing. So I think that just might be stretching a little bit from where he's sort of admitting but for causation. But he also doesn't know the science. So the question really here is, right, still let's sort of go back to the first principle is, the government's position is it is sufficient to ensure at the appropriate statutory language, that that is sufficient, and that he's had the opportunity to consult with counsel if he wishes. That is sufficient to meet the Strickland standard. Yes, Your Honor. And I would also note that here there was really no, and this goes to the failure to investigate point, there was really no reason to think that this was a hard case. This is a case where there was overwhelming evidence of guilt. There was, Barrage was focused on mixed-use cases. That was the concern. And a lot of the progeny that defended sites are in the context of mixed-use. In Barrage, the victim consumed marijuana, oxycodone, and heroin before overdosing. That was not the case here, Your Honor, other than the stray comment noted at the bail proceeding, which I'm … Why do you call it a stray comment? I mean, why do you call it a stray comment? The government didn't say, Judge, this is a stray comment, so you should disregard what I'm saying. But the government said that, I don't remember the exact words, but it was something to the effect that other toxins in addition to heroin were present. It wasn't a stray comment. Your Honor, the government noted at the initial bail hearing fentanyl. But bail hearings are informal affairs before the government has processed discovery, before discovery has been produced to defense counsel. And once that discovery was produced, that discovery, the government had an opportunity to look at, review the record and the file. There's no evidence of anything besides heroin. You look at the actual circumstances of the victim's death here. He was searching for heroin. He met up on February 2, 2018, desperate for heroin. There's nothing in the records other than that comment at the initial bail hearing to suggest that there was any drug present other than heroin. Now … There was nothing other than, but there was that, and it was a statement from the government. Right. Doesn't the complaint talk about a heroin and fentanyl overdose? Your Honor, the complaint notes that a previous sale by the defendant included fentanyl. But here, we're focused on … It says victim one was found dead in this apartment of a heroin and fentanyl overdose. Yes, Your Honor. That's the victim who's the death resulting person for this case, right? Am I wrong? I don't believe that's the case. I would have to look at the complaint, but … We could call it just a stray comment. I don't believe … I believe there was another victim that died of an overdose. The PSR talks about victim two in the offense conduct section as opposed to victim one. So what happened to victim one? He was in charge for that? My understanding is there were no charges brought for victim one, Your Honor. Now, we also have to put ourselves in defense counsel's position here. There was very strong evidence that the overdose death was caused by heroin. Now, Strickland says that a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments. But this is why I wonder why it's not appropriate just to gather some information in this case, because we don't know. Believe me, I can see strategic reasons for making the decisions that were made, but we don't know whether they were strategic or incompetent, because the district court didn't inquire. So why isn't that exact question a trigger for the need to inquire into whether the decision was made out of strategy rather than incompetence? Your Honor, I would first note that it's the defendant's burden on a habeas petition. And the only thing that he provided to suggest that he was – that counsel failed to investigate was his self-serving statement. Well, the record doesn't suggest that there was any investigation, right? There's no statements at the – there's nothing in the record to suggest there was an investigation. Your Honor, I would submit that it's, in my experience, the rare case where there's a plea three months after charging that a defense counsel is going to go on the record and discuss what steps he took with respect to an investigation. But we have to put – but Lee – in Lee, Justice Roberts says court should not have set a plea solely because of post hoc assertions from a defendant about how he would have pleaded. And if we look at the entirety of the record, if we look at the circumstances that defense counsel faced, it's pretty clear. Defense counsel was faced with a situation where there was very strong evidence that the defendant was the but-for cause of the victim's death. There's no question that they met up on February 2, 2018. There's no question from the text messages that the victim was desperate for heroin on that day. He told the defendant that he would offer him an extra tip if he came earlier. After the victim met up with the defendant, there were no more outbound calls or communications from his phone. His last messages were to the defendant. That in and of itself suggests that he liked the overdose shortly after meeting. The medical examiner noted that the cause of death was acute heroin intoxication. And the medical examiner had the opportunity to note other significant conditions contributing to death. That's a quote. That's at Appendix 129. But the medical examiner did not note. So if we put ourselves in defense counsel's shoes, he's faced with all this evidence and the very real possibility that the government would bring a 20-year mandatory minimum charge against his client. In Primo v. Moore, Justice Kennedy recognized the dilemma that defense counsel faced. He said, the absence of a developed or an extensive record and circumstances that neither the prosecution nor the defense case has been well-defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered. Justice Kennedy also noted defense counsel must consider the substantial  variance under the guidelines. And so for all those reasons we do not believe even taking a 20-year sentence as compared with what might be the outcome not only at trial but also from a later plea offer if the case grew stronger and prosecutors stiffened their resolve. So that's the dilemma that defense counsel was facing. And he made a prudent decision to accept a plea offer, which allowed him to argue for a substantial variance under the guidelines. And he did. He did argue for a substantial variance under the guidelines. And so for all those reasons we do not believe, even taking defendant's statement at face value, accepting his proposition, which we think it should not be, that there was a failure to investigate. We think that defense counsel's decision to do so was entirely reasonable. And if I can address, I'm happy to answer more questions. I know I'm over time, but I would also address the child pornography affirmative defense. Unless, okay. So similarly, here defendant argues that defense counsel failed to inform him of an affirmative defense. Now, in United States v. Wiley, this Court said there's no requirement to advise of every affirmative defense, just those that, quote, likely would have succeeded. Defendant would have had the burden to establish that the defense he's claiming here applied. And that defense has three requirements. First, that the defendant possessed less than three images of child pornography. Second, that he deleted them promptly. And third, that he did so in good faith. Now, there was a discussion earlier about the promptly. And the reality is, is that at some point between October 2018, October 25, 2018, and January 2019, it was deleted. The toddler rape video was deleted. Now, all the evidence, we don't know when. Defendant would have the burden to establish that. But what the evidence does show, what the record does show, is that it was deleted in some sort of mass deletion event. Likely a phone wipe of some sort. Now, that plays into the good faith prong as well. Because there's every indication that this is a defendant that has a sexual interest in children. He joined a chat group where — What does the good faith mean in this? Are you saying that he has to — I guess I don't understand what you're claiming the good faith provision of that means. I sort of took it as meaning — and obviously, this just never gets construed. I will tell you, I have never seen anybody possess one image of child pornography. So I've never seen this defense come up. But I sort of thought of it as not — the cops are banging on your door. We want to see your phone, and you're quick deleting it. That doesn't seem like in good faith. Do you think it means something like, I'm deleting this because — I don't know. What do you think it means? Your Honor, as Your Honor is aware, the courts have not defined it. We would argue that under any definition of good faith — Not my definition, where they're banging down your door, and you're going, oh, no, I better delete these. That's — I can see that not being good faith. But that's not an issue here. So under that definition, he would meet the standard, right? Your Honor, the government's view is that, frankly, under any definition of good faith, because of the defendant's interest in child pornography, he would not meet it. But we don't know that he's interested in child — Sorry. We don't know that. But I understand how hard it is to look at these cases and to separate mentally what is legally not child pornography from what is legally child pornography. But this is a defendant who had allegedly thousands of images that did not trigger the legal definition of illegal child pornography and kept those and deleted the one image we have any reason to know he ever had that does cross the line. Why doesn't that weigh in his favor as opposed to against him? I understand that it is — that this is not appealing to anybody and that this collection is — of other — of non-illegal images is upsetting. But it feels like anything, if that weighs in his favor, that the one time he gets an image that crosses the line into illegal, he doesn't add it to his collection. He deletes it. Well, the government — what I would note is that we don't know if this was the one time, because the government was continuing to — It's the only time we have evidence of. So it is, Your Honor. That is correct. The government was continuing to review the defendant's devices. And when we were looking at whether defense counsel was reasonable in the advice that he was given, he — the defense counsel was faced with a defendant that had 30,000 images of — Leech. — erotica. Right. He admitted that he raped a girl and watched child pornography. He admitted that in his diary. That's at Special Appendix 24. After receiving the video, he responded, laugh out loud. Now, putting yourself in defense counsel's shoes — Which I can do. Defense counsel was faced with a situation where it was highly likely or reasonable to assume that additional images would be found. But why not ask defense counsel that question? Your Honor, because we believe that the record and — understanding the record and what was faced by defense counsel at the time and actually defense counsel's own statements is sufficient here. Defense counsel — What statements? Well, this is going backwards a little bit, but defense counsel himself noted that the government forestalled the horrible alternative of either proceeding to trial in this case or pleading guilty to a count carrying a mandatory sentence of 20 years and a potential life sentence in this case. So, you know, we know the dilemma that defense counsel was facing. He sought a global resolution. But he doesn't say, and therefore we've elected not to pursue some available defenses at trial. We don't know if that — if he says that — because that's true. The plea agreement — if he is unaware of Burrage and of the affirmative defense and their potential applicability, then it looks like a great deal. But he doesn't sort of concede. I've evaluated the available affirmative defenses and — right? I don't know that that statement advances them all. Your Honor, in the plea, I don't have the citation, but I am quite sure that defense counsel acknowledged that there were no viable affirmative defenses. Right. So he didn't know there were, which makes him potentially either, I've carefully evaluated them and determined they don't apply, or I just am not a lawyer who knows about those defenses. Your Honor, again, the only evidence — so with respect to — the only evidence that we have that defense counsel did not know about the affirmative defenses was defense — the defendant's own self-serving statements. Now, it cannot be the case where, when the record is otherwise clear, we always require an affidavit from defense counsel. That is not the law. That is not what the Supreme Court said in Lee. That's not what this — the Second Circuit, this Court said in Arteca. When the record is otherwise sufficient for the court to rule on a habeas petition, that is all that is required. I did not address prejudice, but unless the Court has any questions, we would rest on our submission on that. I want to go back for a second to the standard of good faith. Would it meet good faith if the defendant perceived an image unsolicited and promptly, within the definition of promptly, said, oh, this stuff can get me into bad trouble. I'm deleting it. Is that good faith? Perhaps, Your Honor. Perhaps. And that — but that is just not the world that we are in right now, given all of the evidence that the defendant had an interest in child pornography. We cite a number of the record citations. I'm happy to go over that again, but that's not the world that we live in, Your Honor. Yeah. Tell me the page references that you rely on for the interest in child pornography — pornography as opposed to erotic. Certainly, Your Honor. The defendant joined a chat forum where individuals traded child pornography with usernames like Young Lovers, Taboo Perv Daddy. That's PSR 28. The defendant wrote songs about raping children. That's PSR 75. The defendant sought a relationship with a 16-year-old and was in a relationship with her later on. That's Appendix 280. The defendant wrote in his own diary that he, quote, raped a girl and watched child pornography. That's Special Appendix 24. I see that I'm out of — significantly over time. As long as there are questions, the red light can go on. But let me just check with my colleagues. Any other questions? No. All right. Thank you. Mr. White, you've got three minutes for rebuttal. Thank you. A number of points, Your Honors. First, I'll quickly address the government's argument that resulted from — or Mr. Margulies' knowledge of resulted from meant he knew about the ins and outs of Burrage. I'll remind the Court that the government lost in Burrage where it argued for several different interpretations of what results from means. Government argues that there was no evidence that Mr. Margulies was misled. I disagree. Defense counsel identified the wrong standard in his sentencing submission using language that would have reflected the contributing factor test that the Supreme Court expressly rejected in Burrage. I'd also point the Court — I'd also point, Your Honors, to the defense counsel's response to the government's statement of various heroin and fentanyl as evidence that defense counsel simply didn't know the standard. And defense counsel's failure to know the standard is, of course, evidence that defense counsel didn't inform his client of the right standard. But let's be clear. I mean, this is a situation where there's text messages between your client and the decedent about the sale of 30 grams of heroin — 30 glycines of heroin and how badly he wants it. Your client describes it as — or the co-defendant describes it as fentanyl-free. The very last text message ever sent by the decedent is to your client. He's dead the next day. And the death certificate shows the cause of death is acute heroin intoxication. That would seem to support a pretty clear inference that the heroin that was delivered by your client is what caused the death. Your view is that a defense lawyer must get a separate toxicology report and do an additional investigation beyond that. My view is the government, a defense counsel, must investigate what presented with those mere facts. And, Your Honor, the salient point — But all you did was investigate the text messages and the death certificate. You're saying that there's an obligation to do more than that. Sure, Your Honor. The salient point is that there was an 18-hour gap between when Mr. Margulies made this alleged sale and when the decedent's body was found. And there is no evidence in the record at all as to what the decedent did in that 18-hour period. Now, we know — Well, and there's another fact that the facts were — The undisputed facts were not merely, as Judge Sullivan recited, but they also included the undisputed fact of what the government had said at the bail hearing about the presence of fentanyl or whatever it was that they said exactly. That's exactly right. And I think that there's an important clarification that needs to be made based off of your colloquy with counsel for the government, which is the government statement was not that there was fentanyl in the decedent's system. It was that there was various heroin and perhaps fentanyl. Why the various heroin is hugely significant is because the only scientific evidence here is that the medical examiner in a one-page report after not examining the body said that this decedent died of acute heroin intoxication. But if the government's statement on the record is correct that there was various heroin in the decedent's body, that medical examiner's report becomes entirely irrelevant to the question. The question solely becomes whose heroin did he ingest. That's just like Anderson, the case out of the Seventh Circuit, where there was evidence that the decedent had taken multiple doses of heroin. But is there anything in this record to suggest that's the case? There were multiple suppliers on the last day. He's jonesing badly for heroin. He has not had heroin, obviously, in a while. That's what he's saying in the text. He gets heroin from your client. They didn't notice me about that. And he's dead the next day. The very last text message on his phone is to your client. Yes, Your Honor, there is evidence on this record. Well, the government's own admission that there was various heroin in the decedent's system. That is evidence that there's... What does that mean, various heroines in his system? Well, I would bet that... You've got 30 glass scenes, so there may have been different sources that your client delivered, but there's no indication that there's another supplier, is there? That would be my understanding of various... Is there any text that says there's another supplier? Does it even suggest it? Well, the text messages do strongly suggest, I think, undisputably, that the decedent had multiple sources of heroin. This was the decedent's first ever purchase from Mr. Margulies. He reached out to Mr. Erkin, the co-defendant, asking him for 300 of H. That, to me, means this decedent had other sources of heroin. And his frustration with the speed by which Mr. Margulies was delivering the supposed heroin cuts in Mr. Margulies' favor because it shows perhaps this decedent needed his fix quicker and Mr. Margulies wasn't able to deliver it fast enough, and so he reached out and got another delivery. These are all questions that just needed to be explored by defense counsel. Additionally, Your Honor, Mr. Margulies was accused of selling 30 gossips of heroin to the decedent, yet only 21 gossips were found in the apartment. There is no explanation in the record whatsoever for what happened to those nine gossips. To me, it strongly suggests that Mr. or the decedent interacted with another drug user and likely seller in the interim period. Another point I'd like to identify that's not clear in the record is that this sale was made around 6 or 7 p.m. on a street corner in Brooklyn. The decedent was found dead in his home 18 hours later. We have no sense what happened in that interim period. We don't know where he went, but we do know that there was some period of time where the decedent traveled from this street in Brooklyn through an area that, if defense counsel, under a proper investigation, would have explored, would have understood whether that's a high drug traffic area, would have undertaken a review of the glass seeds that were found, would have... Again, this sounds to me like you're on the prejudice prong. You're saying that a reasonable investigation might have turned something up. Is there more to it than that? I think a reasonable investigation would... It is reasonably likely under this Court standard that it would have created sufficient evidence to dispute the government's death-resulting theory such that the ultimate proceedings could have... It was reasonably likely they could have ended differently, for sure. And I'll remind the Court, I... The government has not identified a single case where the sole evidence presented to defense counsel here was sufficient to sustain a conviction. The government, in its presentation here today, asked Your Honors to stand in the shoes of defense counsel. Judge Miriam, you astutely point out you know how to do that. Defense counsel, presented with the mere evidence of a few text messages but a significant 18-hour gap and a bare-bones report from the chief medical examiner, would have conducted a thorough investigation into everything they possibly could have found out about the cause of the decedent's death. Now, maybe there's some chance defense counsel did that here. I think that's highly unlikely because Mr. Margulies, one, has said he didn't, in his view. And the record, I think, screams out the fact that Mr. Margulies' counsel simply didn't know about the standard. And so he was operating in a universe in which the mandatory minimum was far more likely than he thought it was. I have one other... I'm not sure if this is a question or a comment, but reflecting more on the argument of the government that because the Supreme Court said in Burrage that the plain meaning of resulting from is the but-for causation standard as opposed to contributing cause, that we must regard that as a fixed rule, that we must accept that the ordinary person upon confronting this term would understand it to mean that. The Supreme Court, although it is undoubtedly supreme, and has total authority with respect to certain kinds of questions, questions of the meaning of federal law, does not have any particular authority with respect to other questions, questions that are not issues of federal law. And when it comes to... When the Supreme Court expresses a view of what some historical fact was or a fact that relates to expertise, such as the question we have, what would the ordinary citizen understand by the term resulted from? The Supreme Court doesn't really have any authority on that question. They can say that resulting... that the plain meaning of resulted from is this or is that, and that becomes fixed in law. But it doesn't mean that we must accept that the ordinary citizen would understand that because this is the Supreme Court going outside of the area of its competence. It simply is not authorized to express views. I mean, it's authorized to express them, but they don't have the force of law, as is the case when the Supreme Court says something is the law. If I may respond, I know I'm out of time, but I agree, Judge LaValle, the causation issues are regularly litigated extensively by lawyers across the country in different courts, leading to circuit splits and Supreme Court decisions like you have in Burrage. For the proposition that Mr. Margulies on these facts understood precisely what the government's burden was to prove that but for his alleged sale of heroin, this decedent would not have died, I think it's not in the record, first and foremost, and I think it just fails a common-sense standard, I think, along the lines of what Judge LaValle is looking at. Thank you.